ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL (199706)
CARMEN A. MEDICI (248417)
ARTHUR L. SHINGLER III (181719)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
cmedici@rgrdlaw.com
ashingler@rgrdlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
GEORGE C. AGUILAR (126535)
JENNY L. DIXON (192638)
ERIC M. CARRINO (310765)
5040 Shoreham Place
San Diego, CA  92122
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
jdixon@robbinsarroyo.com
ecarrino@robbinsarroyo.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER ROSENSTEIN, M.D., Individually and on Behalf of All Others Similarly Situated, | Case No. **'19 CV 1754 GPC WVG** |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND CALIFORNIA BUSINESS & PROFESSIONS CODE §§16700, *et seq*. AND 17200, *et seq*. |
| AMERICAN BOARD OF ORTHOPAEDIC SURGERY and AMERICAN BOARD OF MEDICAL SPECIALTIES, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff Alexander Rosenstein, M.D. ("plaintiff"), individually and on behalf of all those similarly situated, brings this action for treble damages and injunctive relief against defendants for violations of the Sherman Antitrust Act ("Sherman Act"), California's Cartwright Act ("Cartwright Act") and California's Unfair Competition Law ("UCL").[1]  Based on counsel's investigation, research and review of publicly available documents, on plaintiff's personal knowledge, and upon information and belief, plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      For years ABMS and its member boards, including ABOS, have abused and continue to abuse their dominant position within the American medical community, receiving massive, illegally obtained revenue through anticompetitive means.  Not only has their conduct been at the expense of physicians nationwide, it has sharply curtailed, if not eliminated, fair competition in the field of medical specialty certification maintenance.

2.      In addition to obtaining a license to practice medicine from the states in which they practice and other state-mandated requirements, physicians obtain one or more industry-specific certifications in a particular specialization within the field of

---

[1]    Defendants include the American Board of Medical Specialties ("ABMS") and the following certifying medical specialty board that ABMS encompasses:  the American Board of Orthopaedic Surgery ("ABOS").  In addition to this board, ABMS also consists of 23 more certifying medical specialty boards that are also co-conspirators with defendants.  These ABMS member boards include:  the American Board of Obstetrics and Gynecology; the American Board of Dermatology; the American Board of Allergy and Immunology; the American Board of Colon and Rectal Surgery; the American Board of Family Medicine (a/k/a American Board of Family Practice); the American Board of Internal Medicine; the American Board of Medical Genetics and Genomics; the American Board of Neurological Surgery; the American Board of Nuclear Medicine; the American Board of Ophthalmology; the American Board of Anesthesiology; the American Board of Emergency Medicine; the American Board of Otolaryngology - Head and Neck Surgery; the American Board of Pathology; the American Board of Pediatrics; the American Board of Physical Medicine and Rehabilitation; the American Board of Plastic Surgery; the American Board of Preventive Medicine; the American Board of Psychiatry and Neurology; the American Board of Radiology; the American Board of Surgery; the American Board of Thoracic Surgery; and the American Board of Urology.  ABMS and all of its member boards are collectively referred to herein as "ABMS."

medicine.  This is called Initial Board Certification ("board certification" or "IBC").
The purpose of IBC is to indicate that, beyond meeting state licensing requirements, a
board certified doctor also has demonstrated the skill, knowledge and ability to
practice the medical specialty for which he or she is certificated.

3.  More than 29,000 licensed physicians are members of ABOS, and
approximately 90% of the over 880,000 licensed physicians in the United States are
board certified in at least one medical specialty by ABMS, which, as the dominant
seller of IBC through its member boards, including ABOS, has monopoly power in
the IBC market.

4.  Far beyond being simply a voluntary act taken by some doctors to
demonstrate a specific medical skill or to distinguish themselves from other doctors,
board certification has evolved to become an essential component of a physician's
commercial practice.  Indeed, it has become a *de facto* requirement for meaningful
participation in the commercial practice of medicine.  Fully licensed doctors
authorized to practice medicine cannot expect to maintain a commercial practice,
including the core requirements that they be able to maintain hospital admitting
privileges, maintain malpractice insurance and, perhaps more importantly, treat a
majority of the commercially insured patients in the United States, without being
board certified.  Thus, failure by physicians to maintain their board certification is
likely to have devastating effects on their livelihood, income and ability to practice
medicine.  Defendants' conduct also has the attendant effect of depriving patients of
choice in service providers.

5.  In addition to selling IBC, ABOS and other ABMS member boards
requires that board-certified doctors also maintain their IBC by purchasing
"maintenance of certification" or "MOC" from ABOS or the ABMS member boards.
Failure to purchase MOC results in loss of certification, regardless of a physician's
skill or ability within their given specialty.  Indeed, purchasing MOC from a provider
other than ABOS or other ABMS member boards results in loss of IBC because the

1  boards will not recognize any MOC other than that purchased through them.  Given

2  the realities of maintaining a commercial practice of medicine, doctors have no

3  practical choice about maintaining their IBC.

4        6.     In addition to its monopoly of the market for board certification, ABOS

5  and other ABMS member boards also maintain a monopoly of the market for MOC.

6  As described herein, ABOS and other ABMS member boards tie the required

7  purchase of MOC with the sale of IBC.  Thus, because IBC is a *de facto* requirement

8  for maintaining a commercial medical practice, and because the failure of a physician

9  to submit to ABOS's and other ABMS member boards' imposition of forced MOC

10  effectively results in loss of IBC, meaningful competition in the MOC market is

11  foreclosed.  ABOS and other ABMS member boards further will not accept any MOC

12  other than their own, revoking a physician's IBC where an MOC is not obtained from

13  ABOS or other ABMS member boards, and thus other MOC providers and other

14  potential MOC providers are excluded from the market and its competition.

15        7.     Through their MOC monopoly, defendants abuse their position to extract

16  inflated supracompetitive payments for MOC from certificated physicians and engage

17  in other predatory and anticompetitive activities.  Plaintiff, fair competition, and

18  American medical community participants – from physicians to competitor

19  certification providers to patients – have been injured.

20        8.     Accordingly, plaintiff, individually and on behalf of a class of those

21  similarly situated, seeks damages, injunctive relief, and all other appropriate relief for

22  defendants' wrongdoing.

23  **JURISDICTION AND VENUE**

24        9.     Plaintiff's claims for injuries sustained by reason of, *inter alia*,

25  defendants' violations of §§1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, are

26  brought pursuant the Clayton Act, 15 U.S.C. §§15 and 26, to obtain damages and

27  injunctive relief and the costs of this suit, including reasonable attorneys' fees.

28

10.    This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Court pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

11.    Venue is proper in this judicial district pursuant to §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391(b), (c) and (d), because defendants reside, transact business, are found, or have agents in this District; a substantial part of the events giving rise to plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because acts in furtherance of the alleged wrongdoing took place here.

12.    Further, defendants operate and transact business within this District, defendants have substantial contacts with this District, and defendants engaged in illegal conduct that was directed at, and had the effect of causing injury to, persons and entities residing, located, or doing business in this District.  ABMS's and ABOS's contacts with the State of California are extensive.  It is estimated that almost one in every eight physicians in the United States resides in California – more than any other U.S. state.

**THE PARTIES**

13.    Plaintiff Alexander Rosenstein, M.D. ("Dr. Rosenstein") has been in practice for nearly 30 years.  Dr. Rosenstein is certified by the ABOS and was recertified in both 2000 and 2010.  Dr. Rosenstein is an extremely accomplished doctor, licensed in California, Hawaii, Texas and West Virginia.  After earning his medical degree from the University of Minnesota School of Medicine, he completed his residency at the University of California San Diego Medical Center in San Diego, California and went on to complete a year-long fellowship in Adult Reconstruction and Joint Replacement at Oxford University in England.  He returned to California and practiced there for more than 15 years.  Later, he was an Associate Professor of Orthopaedic Surgery at Texas Tech and then a full Professor of Orthopaedic Surgery

1   and Biomedical Engineering at the University of Texas.  He has written numerous

2   peer-reviewed scholarly articles and won many awards relating to the practice of

3   medicine generally and orthopaedic surgery specifically.  Throughout his career, he

4   has both continuously practiced and held various esteemed positions, including,

5   among others: (1) at the South Coast Medical Center in Laguna Beach, California, he

6   was the Chief of Staff, the Director of the Hospital Governing Board, the Chairman of

7   the Department of Surgery, and the Chairman of the Division of Orthopaedic Surgery;

8   (2) at Texas Tech in Lubbock, Texas, he was the Chief of the Adult Reconstruction

9   Division, an Associate Clinical Chair of the Department of Orthopaedic Surgery, and

10   the Director of Adult Reconstruction Fellowship; (3) at Memorial Hermann Hospital

11   in Houston, Texas, he was the Director of Adult Reconstruction, the Physician Leader

12   for OR Orthopaedic Surgery, an Associate Chair of the Department of Orthopaedic

13   Surgery, and the Director of the Adult Reconstruction Fellowship; (4) at the

14   Charleston Area Medical Center in West Virginia, he was the Director of Orthopaedic

15   Reconstructive Surgery and the Director of the Adult Reconstruction Fellowship; and

16   (5) at the Kona Community Hospital in Hawaii, he is the Director of Orthopaedic

17   Reconstructive Surgery.  Over the course of his career, Dr. Rosenstein has taught

18   hundreds of residents, if not more, on techniques specific to orthopaedic surgery and

19   on being a medical professional in general.  He is intimately involved with what is

20   required to be an orthopaedic surgeon and what is required from a practice and

21   educational standpoint to maintain a high quality standard of care.  Dr. Rosenstein

22   currently is a resident of Hawaii, but has also lived in California, West Virginia and

23   Texas during his professional career.

24       14.    Defendant American Board of Orthopaedic Surgery is a non-profit

25   organization that became an ABMS member in 1935.  With more than 29,000 Board

26   Certified Orthopaedic Surgeons in the United States (more than a thousand of which

27   reside in California), it has one of the largest memberships of any Board in the

28

country.  ABOS is headquartered at 400 Silver Cedar Court in Chapel Hill, North Carolina.

15.  Defendant American Board of Medical Specialties is a nationally recognized non-profit organization that sets the standards for and certifies doctors as capable in specified medical specialties and subspecialties, as described herein, through its 24 member boards.  ABMS is headquartered in Chicago, Illinois.

### FACTUAL ALLEGATIONS

16.  To practice medicine in the United States, physicians and surgeons are required to have obtained an MD degree, pass the U.S. Medical Licensing Examination ("USMLE"), and obtain a license granted by their individual state licensing board.  The USMLE uniformly serves the function for all states of assessing physician readiness and ability to practice medicine (as the USMLE describes it, the "ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care")[2] and "ensur[ing] that all licensed MDs . . . pass[] the same assessment standards – no matter in which school or which country they had trained."[3]

17.  In addition, all but five states have a minimum continuing medical education ("CME") requirement for physicians to maintain their licenses "in order to ensure the continuing competence of licensed physicians and surgeons."[4]

---

[2]  *About USMLE*, USMLE, https://www.usmle.org (last visited Sept. 11, 2019).

[3]  *Why One National Examination*?, USMLE, https://www.usmle.org/about/ (last visited Sept. 11, 2019).  The USMLE's purpose is to provide "high-quality assessments across the continuum of physicians' preparation for practice," including "provid[ing] to licensing authorities meaningful information from assessments of physician characteristics – including medical knowledge, skills, values, and attitudes." *USMLE Mission Statement*, USMLE, https://www.usmle.org/about/ (last visited Sept. 11, 2019).

[4]  *See, e.g.*, Cal. Bus & Prof. Code §2190; *see also, e.g.*, Title 22 Tex. Admin. Code §166.2 (2019); Oregon Medical Board, Ch. 847, Div. 8, 847-008-0070, Continuing Medical Competency (Education), https://secure.sos.state.or.us/oard/viewSingleRule.action?ruleVrsnRsn= 238932 (last visited Sept. 11, 2019).

18.     Alongside state licensing of physicians, board certification is an industry-centric private process whereby physicians can obtain one or more certifications in a particular specialization within the field of medicine from a group of experts in that specialization.  For example, in addition to being a licensed physician, a doctor might be certified in internal medicine, medical oncology, geriatric medicine and/or any one of a number of additional specialties and subspecialties.  The purpose of IBC is to indicate that, beyond meeting state-mandated licensing requirements, a physician has also demonstrated distinct skills, knowledge and abilities to practice a medical specialty in a particular field of medicine.

19.     Currently, approximately 90% of all licensed physicians in the United States – over 880,000 doctors – are board certified in at least one medical specialty.[5] ABMS is the dominant provider of IBC in the United States.

20.     The value of specialty certification initially stems from its information-providing function, something particularly helpful in an industry like healthcare in which consumers may largely have incomplete information concerning doctor quality and skills, as well as its potential pro-competitive effects.  As the U.S. Department of Justice ("DOJ") states, "certification can signal that a practitioner has distinct skills, knowledge, and abilities to practice a specialty that go beyond licensing."[6]  The DOJ continues, explaining:

> That signal can promote specialization, choice, and competition.  For example, a consumer with specialized needs can more efficiently search for providers who have signaled expertise in the relevant specialty.  In

---

[5]   *See* Trisha Torrey, *What Is Medical Board Certification?*, https://www.verywellhealth.com/what-is-medical-board-certification - 2615005 (last visited Sept. 11, 2019); *see also* ABMS News Release, *American Board of Medical Specialties Releases Updated Board Certification Report* (Oct. 3, 2017) ("More than 880,000 physicians are board certified . . . .").  The remaining non-certified but licensed doctors generally engage in research or academia, or treat cash-paying or government insured patients.

[6]   Letter from Robert Potter, Chief Competition Policy & Advocacy Section, U.S. Department of Justice, to Dan K. Morhaim, M.D., Maryland House of Delegates, at 10 (Sept. 10, 2018), https://mhcc.maryland.gov/mhcc/pages/home/workgroups/documents/moc/DOJ_Letter.pdf (last visited Sept. 11, 2019).

turn, a provider may attract more consumers or charge a premium reflecting the value of the specialized service, and that premium may encourage other providers to pursue that specialty and offer services in that narrower market.  Certifications can also signal enhanced quality, perhaps by certifying that a provider has demonstrated a certain level of training, testing, or experience over and above other providers. That signal can help consumers distinguish among providers for the same service based on the quality of service they expect to receive.  This ability to distinguish may provide higher quality providers an incentive to invest in higher quality care.[7]

21.    However, in the context of IBC, the DOJ has expressed specific competition-related concerns:

Private certifying bodies . . . can raise competition concerns under certain circumstances.  Certifying bodies are frequently governed by active market participants.  Because, like other forms of professional standards-setting, certification can become a de facto requirement for meaningful participation in certain markets, a certification requirement may create a barrier to entry.  In such circumstances, certification may function more like licensing requirements – establishing who can and cannot participate in a market – rather than voluntary certification that can help patients and others distinguish on quality among a range of providers.[8]

22.    The DOJ continues:

The more certification comes to resemble licensing, the more such industry self-regulation raises similar concerns.  For example, as the U.S. Supreme Court has explained, though market participants offer important and needed experience and expertise about their practice and profession, such professionals, when empowered to set licensing requirements without meaningful review, "may blend [ethical motives] with private anticompetitive motives in a way difficult even for market participants to discern."  Similarly, competitive concerns can arise when private standard-setting processes become "biased by members with economic interests in restraining competition."  The governing members of a dominant certifying body may have incentives to set certification requirements more stringently than is necessary to certify that providers have the relevant knowledge and skills.  In situations where one certifying body has become dominant, such that physicians cannot turn to alternative bodies for a similar certifying function, market forces might not constrain the dominant body from acting on these incentives. If requirements artificially constrain the supply of certified providers and raise their costs, certification may limit competition among providers and

---

[7]  *Id.*

[8]  *Id.* at 10-11 (citing, *e.g.*, *ABMS Board of Directors*, Am. Bd. of Med. Specialties (last visited Aug. 29, 2018), https://www.abms.org/about-abms/governance/abms-board-of-directors/ (vast majority of board members are medical doctors); *Board of Directors*, Am. Bd. of Internal Med., https://www.abim.org/about/governance/board-of-directors.aspx (last visited Aug. 29, 2018) (same).

1  allow for providers to raise prices paid by payers and consumers. As this
2  letter discusses further below, if competition among bona fide certifying
   bodies were to develop, that could provide a meaningful check on such
3  incentives. Moreover, even where there is no effective competition
   among certifying bodies, incentives to raise barriers for physicians to
4  practice medical specialties by setting unnecessarily stringent
   certification requirements could be circumscribed to the extent a
5  certifying body has procedures in place to ensure that input is available
   from, and decision-making is vested in, groups that represent a balance
6  among the various relevant stakeholders, including not only doctors, but
   also, potentially, hospitals, insurers, and patient advocacy groups.[9]

7      23.    Implicating the very concerns raised by the DOJ, ABMS certification has

8  become a foundational component of the practice of medicine in the United States. It

9  is so essential, in fact, that a doctor who is fully licensed by their state and authorized

10  by law to practice medicine but who is not also a board certified physician in their

11  given specialty cannot expect to maintain a commercial practice, including

12  maintaining hospital admission privileges, and, most significantly, treat a majority of

13  the roughly 217 million commercially insured U.S. residents.[10]

14      24.    ABMS is well aware of these requirements, acknowledging that:

15        Hospitals and health care groups . . . use a credentialing process
          that involves checking a physician's Board Certification, education,
16        training, experience, and other background information before granting
          practice privileges. Insurance companies, law firms, recruiters, and
17        research organizations also regularly check Board Certification status for
          their particular purposes.[11]

18
19      25.    Insurance companies place significant weight on, if not requiring or

20  effectively requiring, board certification. By way of example, as relevant here, in

---

21  [9]  *Id.* at 11-12 (citing *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 135 S.
22  Ct. 1101, 1111, 1115 (2015) ("State laws and institutions are sustained by this
    tradition when they draw upon the expertise and commitment of professionals."); and
23  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501, 509 (1988)
    (noting that "private standards can have significant procompetitive advantages" if
24  "procedures . . . prevent the standard-setting process from being biased by members
    with economic interests in stifling product competition")).

25  [10]  *See* Edward R. Berchick, *et al.*, *Health Insurance Coverage in the United States:*
26  *2017*, U.S. Census Bureau, at 4, Table 1 (Sept. 2018), https://www.census.gov/
    content/dam/Census/library/publications/2018/demo/p60-264.pdf (last visited Sept.
    11, 2019).

27  [11]  *Verify Certification*, ABMS, https://www.abms.org/verify-certification (last visited
28  Sept. 11, 2019).

1    order to be considered for becoming an Anthem-credentialed healthcare provider,

2    doctors are required to "have current, in force board certification (as defined by the

3    American Board of Medical Specialties ('ABMS') . . .) in the clinical discipline for

4    which they are applying."[12]    ABMS certification is also a central consideration of

5    being credentialed for Aetna's doctor network.[13]    Cigna, likewise, requires board

6    certification for application to its Medical Network Credentialing.[14]

7        26.    The dominant entity providing specialty IBC to doctors in the United

8    States is ABMS.  ABMS was originally established in 1933 by a small organization of

9    medical specialty boards and groups of physicians and medical educators.  Its purpose

10    was to develop "a national system of standards for recognizing specialists and

11    providing information to the public."[15]    ABMS developed and oversees a uniform

12    system for the administration of examinations designed to assess physician education,

13    knowledge, experience and skill in given medical specialties.

14        27.    In the years since its inception, ABMS has grown in the number of

15    specialties for which it provides certification, as additional specialty boards were

16    added to ABMS.  All but six of the ABMS member boards joined ABMS by 1949.[16]

---

[12]  *Anthem Provider Administration – Credentialing and Maintenance*, Anthem Blue Cross and Blue Shield – Provider Manual (July 2016), https://www11.anthem.com/provider/noapplication/f0/s0/t0/pw_b154811.pdf?refer=ahpprovider (last visited Sept. 11, 2019).

[13]  *Medical Credentialing, What does the Aetna doctor credentialing process involve?*, Aetna, http://www.aetna.com/docfind/cms/assets/pdf/MedicalCredentialing.pdf(last visited Sept. 11, 2019).

[14]  *Cigna Medical Network Credentialing*, Cigna, https://www.cigna.com/health-care-providers/credentialing/join-medical-network (last visited Sept. 11, 2019).

[15]  *ABMS History of Improving Quality Care*, ABMS, https://www.abms.org/about-abms/history (last visited Sept. 11, 2019).

[16]  American Board of Dermatology (1933), American Board of Obstetrics and Gynecology (1933), American Board of Ophthalmology (1933), American Board of Otolaryngology – Head and Neck Surgery (1933), American Board of Orthopaedic Surgery (1935), American Board of Pediatrics (1935), American Board of Psychiatry and Neurology (1935), American Board of Radiology (1935), American Board of Urology (1935), American Board of Internal Medicine (1936), American Board of Pathology (1936), American Board of Surgery (1937), American Board of

1    Five member boards joined in the ten years between 1969 and 1979.[17]  The final

2    member board joined in 1991.[18]  Thus, for the majority of the twentieth century and, at

3    least, for almost thirty years, ABMS has maintained a monopoly as the provider of

4    medical specialty IBC in the United States.  Today, ABMS certifies physicians in 40

5    specialties and 87 subspecialties.[19]

6         28.    ABMS's initial certification occurs after a physician completes residency

7    training and generally requires that physicians complete four years of college or

8    university premedical education, earn a medical degree from an ABMS-approved

9    medical school, complete a three to seven-year ABMS-approved residency, provide

10   attestation letters from the director and/or faculty of their residency program, and

11   become licensed to practice medicine in their state.  ABMS also requires that IBC

12   candidates pass an ABMS exam in the specialty for which the physician seeks

13   certification.  Similarly, physicians seeking subspecialty certification must also

14   complete ABMS-approved additional training during or after their residency, as well

15   as successfully complete additional subspecialty-specific knowledge and clinical

16   judgment assessments.

17        29.    Historically, receiving certification was sufficient for board certification

18   for the remainder of a physician's career.  By the mid-1980s, ABOS and certain other

19   ABMS member boards had begun to issue certifications for new applicants that

20

21

---

22   Neurological Surgery (1940), American Board of Anesthesiology (1941), American
     Board of Plastic Surgery (1941), American Board of Physical Medicine and
23   Rehabilitation (1947), American Board of Colon and Rectal Surgery (1949), and
     American Board of Preventive Medicine (1949).

24   [17]  American Board of Family Medicine (1969), American Board of Allergy and
     Immunology (1971), American Board of Nuclear Medicine (1971), American Board
25   of Thoracic Surgery (1971), and American Board of Emergency Medicine (1979).

26   [18]  American Board of Medical Genetics and Genomics (1991).

27   [19]  *ABMS Guide to Medical Specialties*, ABMS (2019), https://www.abms.org/ media/
28   194925/abms-guide-to-medical-specialties-2019.pdf (last visited Sept. 11, 2019).

1    required retesting after 10 years in order to maintain their certification.  Physicians

2    with lifetime certifications, however, were exempt from these requirements.

3         30.    By the early 2000s, ABMS required all of its member boards to

4    uniformly agree that, with the exception of lifetime certificate holders, certification

5    would only be granted to physicians for limited time periods followed by mandatory

6    retesting in order to maintain certification.  In the years since then, the requirements

7    for maintaining IBC have increased.  As discussed above, failure to maintain

8    certification is devastating to a physician's ability to treat the vast majority of patients

9    in the United States, and certainly would spell destruction for their medical practice.

10   Indeed, the certification renewal requirements "effectively converted the 'voluntary'

11   aspect of board certification to a requirement to maintain hospital privileges and

12   insurance panel participation and profoundly impact[] a physician's ability to earn a

13   living."[20]

14        31.    The ABOS certification renewal requirements became what is called

15   Maintenance of Certification or MOC.  Similar requirements exist for all ABMS

16   member boards.

17        32.    ABOS and all other ABMS board MOC began in the latter part of the

18   twentieth century as a voluntary retesting.  Very few physicians participated.  In or

19   around 2005, however, ABMS added more requirements to MOC for re-certification.

20   MOC then required a minimum number of "'MOC points'" accumulated via

21   "performance improvement projects and data collection exercises" as a prerequisite to

22   the re-examination of physicians.[21]  In the years that followed, ABMS and the member

23   _____

[20]  Westby G. Fisher & Edward J. Schloss, *Medical specialty certification in the United States – a false idol?*, 47 J. of Interventional Cardiac Electrophysiology 37 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5045479/ (last visited Sept. 11, 2019).  These renewal requirements also have been described as the "watershed moment [that] forever changed the landscape of specialty certification from one that primarily served the needs of practicing physicians to one that threatened 'uncertain consequences' and mandated additional requirements designed in large part to serve the ethical views and ongoing financial needs of the Specialty Boards." *Id.*

[21]  *Id.*

- 12 -

1    boards expanded the number of required MOC points over shorter time periods.

2    Moreover, failure to comply with defendants' MOC requirements would be publicly

3    labeled as "'not meeting MOC requirements'" and would result in IBC revocation if

4    not ultimately complied with.[22]

5        33.    The cost of ABMS MOC requirements to maintain physician certification

6    has grown exponentially.  For example, "[t]he cost of participating in MOC in general

7    medicine mushroomed 244% (or 16.3% per year) from $795 in 2000 to $1940 in

8    2014.  Similarly, the cost for subspecialty re-certification grew 257% (or 17.2% per

9    year) over the same time period." [23]   The top-earning specialties, which includes

10   orthopaedic surgeons, bear even greater costs.  As an example, "[a] recent cost

11   analysis estimated general internists incur an average cost of $23,607 (95% CI $5380

12   to $66,383) and cardiac electrophysiologists incur an average cost of $52,196 (95% CI

13   $9773 to $115,916) in total MOC costs over 10 years."[24]   These costs and fees are

14   unchecked by any meaningful competition due to defendants' anticompetitive

15   conduct.

16       34.    ABOS and all other ABMS board MOC is not the same as state-

17   mandated CME requirements, under which physicians are required by their licensing

18   states to accumulate a minimum number of CME credits regularly over a number of

19   years as part of maintaining their license to practice medicine.  CME is a valuable part

20   of continuing physician knowledge that enhances a physician's practice.  MOC is a

21   separate set of requirements imposed, not by the states, but by defendants on

22   physicians in order for physicians to maintain their certifications.

23

24   _____

[22]  *Id.*  Significantly, "[t]hese new re-certification mandates were conceived or

25   overseen by ABMS-imposed leadership officers of whom only 9% collectively had
     recertified in general medicine and 25% had recertified in any certified subspecialty."

26   *Id.*

27   [23]  *Id.*

28   [24]  *Id.*

35.    In the context of CME, ABMS MOC has been described as "add[ing] little more than an additional burden to physicians' time and finances."[25]  It too, adds a meaningful burden to a doctor's support staff, who must help track the ever-changing requirements and document compliance efforts. Research indicates no credible evidence that the ABMS program has led to patient outcome improvements since the MOC requirements' inception.[26]  Indeed, in relation to those physicians with lifetime certifications who maintain their ABMS specialty certifications without any participation in MOC, research indicates "no differences in outcomes for patients cared for by internists with time-limited or time-unlimited certification for any performance measure."[27]    Similarly, there is no evidence whatsoever of lesser performance by physicians who are "grandfathered in" and do not have to participate in MOC.

36.    MOC does little to demonstrate whether a doctor is capable of practicing in his or her chosen field and does not evaluate his or her ability to take care of

---

[25] *Id.*  MOC is distinct in this regard from initial certification, which is unchallenged by plaintiff and the class.

[26] *Id.*; *see also* P.N. Fiorilli, *et al.*, *Association of Interventional Cardiology Board Certification and In-Hospital Outcomes of Patients Undergoing Percutaneous Coronary Interventions*, 63 J. Am. Coll. Cardiology 2904-05 (Apr. 1, 2014) (a study that examined the effect of physician certification status, including lapsed certification, on patient outcomes revealed no effect after coronary intervention); T.H. Lee, *Certifying the Good Physician, A Work in Progress*, 312 J. Am. Med. Ass'n 2340-42 (Dec. 9, 2014) (according to two studies, re-certification and performance or quality measures are not associated).

[27]    John H. Hayes, *et al., Association Between Physician Time-Unlimited vs Time-Limited Internal Medicine Board Certification and Ambulatory Patient Care Quality*, 312 J. Am. Med. Ass'n 2358 (Dec. 10, 2014).  Importantly, there is no reconciling the purported justification by ABMS for mandatory MOC requirements in maintaining ABMS certification – "ensur[ing] better patient care through a physician's participation in an ABMS MOC process which continually assesses and helps enhance professional medical knowledge, judgment, professionalism, clinical techniques, and communication skills" – with the fact that a significant number of physicians with initial board certifications – those with lifetime certifications that pre-date the MOC requirements – are exempt from the costs of MOC compliance, including fees, educational curriculum, testing and time costs. *ABMS Overview and FAQs*, ABMS (Jan. 2016), https://www.abms.org/media/93956/abms-moc_overview_6-15.pdf (last visited Sept. 11, 2019).

1    patients.  Rather it serves as a measure of who can afford to take the test, who is a

2    good test-taker, and who has enough time to take away from their family and practice

3    to prepare for the re-certifications.

4        37.    ABOS's conduct in changing its requirements, in particular, demonstrates

5    the miniscule value MOC has to practicing physicians.  In the past years, ABOS has

6    begun to provide alternate ways in which to complete certification where a physician

7    is required to read materials given by the board and take a test on those materials.

8    This alternative – which like the original testing does not squarely address whether

9    adequate patient care is being given – clearly demonstrates that the original testing is

10   of little value, otherwise why could it be replaced by a reading comprehension exam.

11       38.    Physicians, as well, express dissatisfaction with defendants' MOC.  For

12   example, the following are attributed to "physicians representing various specialties

13   across the U.S.":

- "'Board recertification has almost nothing to do with my daily work as a primary care physician.  It is an angst-generating exercise in arcane minutiae that robs me of work and family time for little gain or benefit. In my opinion, it is academic extortion and a blatant money grab.  Unless absolutely forced to because of business reasons, I hope not to recertify a third time as it is a painful experience that does not really help me or my patients.'"

- "'After starting the MOC process for family medicine, I realized there was no relevance to my current practice of medicine and that it was pure busy work and a waste of my time.  Having recertified six times before taking the same test that residents fresh out of training were taking, I could not find any reason for the change. The certification board was assuming duties left to state licensure boards with a huge overreach grab for power.  As I investigated further, the board could not supply me with a satisfactory explanation or real science to back up their claims.  They were making a voluntary program mandatory with financial gain and power on their part as the real reason.'"

- "'Board certification used to be a mark of excellence, not a form of extortion, revenue generation and busywork. Maintenance of certification, with its practice improvement, patient voice, patient safety, and secured high-stakes examination, has no bearing on what happens in the examination room; there is zero impact on the actual care of patients. I have to recertify, otherwise I cannot maintain my insurance, hospital, or employment relationships; this is what makes it extortion'"

- "'Board certification under ABMS is not essential to my practice of family medicine.'"[28]

39.    Physicians are not averse to "lifelong learning."[29]  As an industry-leading cardiologist has stated in reference to the American Board of Internal Medicine's MOC:

> We all support lifelong learning, but an excellent alternative to MOC already exists:  continuing medical education (CME). Currently, medical licensure for physicians requires an annual minimum of approximately 25 hours of CME, depending on the state. Physicians accept this requirement because they perceive it as having value. Organizations providing recognized CME programs are regulated by the Accreditation Council for Continuing Medical Education, which requires each CME offering to provide an "educational gap analysis," a needs assessment, information about speakers' potential conflicts of interest, and course evaluations, as well as meeting other performance standards. ***CME offerings must compete with one another, and they therefore provide choice***.  If physicians do not perceive value in a particular CME offering, they will go elsewhere – a situation in stark contrast with the ABIM monopoly on MOC.[30]

40.    The American Medical Association ("AMA"), likewise, has not remained silent on the subject.  While the AMA "supports physician accountability, life-long learning and self-assessment," in 2014 it adopted a "policy [that] outlines principles that emphasize the need for an evidence-based process that is evaluated regularly to ensure physician needs are being met and activities are relevant to clinical practice":

- MOC should be based on evidence and designed to identify performance gaps and unmet needs, providing direction and guidance for improvement in physician performance and delivery of care.

- The MOC process should be evaluated periodically to measure physician satisfaction, knowledge uptake, and intent to maintain or change practice.

- MOC should be used as a tool for continuous improvement.

---

[28]  *Physicians fed up, feel trapped by MOC*, Medical Economics (April 10, 2016), http://www.medicaleconomics.com/medical-economics-blog/physicians-fed-feel-trapped-moc (last visited Sept. 11, 2019).

[29]  Paul S. Teirstein, *Boarded to Death – Why Maintenance of Certification is Bad for Doctors and Patients*, 372 New Eng. J. Med. 106, 108 (2015).

[30]  *Id*. (emphasis added).

- The MOC program should not be a mandated requirement for licensure, credentialing, payment, network participation or employment.

- Actively practicing physicians should be well-represented on specialty boards developing MOC.

- MOC activities and measurement should be relevant to clinical practice.

- The MOC process should not be cost-prohibitive or present barriers to patient care.[31]

None of these standards is met by the ABMS MOC.

41.    Defendants' conduct constitutes an unreasonable restraint of interstate trade and commerce in violation of the Sherman Act and the laws of various states.

42.    As a result of defendants' unlawful conduct, plaintiff and the other members of the Class (as defined herein) have been injured in their business and property in that they have paid more for MOC than they would have paid in a competitive market.

**THE RELEVANT MARKET**

43.    For purposes of this action, the relevant geographic market is the United States.

44.    Interstate commerce is substantially affected by the conduct challenged herein.

45.    The relevant product markets include (i) the IBC market, and (ii) the MOC market. These markets are distinct and not interchangeable, as demonstrated by the fact that ABMS sold IBC long before it started selling MOC and excludes a material number of pre-MOC IBC purchasers from being forced to purchase MOC in order maintain their certification.

46.    By ABMS's and ABOS's unlawful conduct challenged herein and the fact that ABMS has and continues to monopolize and maintain the MOC market,

---

[31] *AMA adopts principles for maintenance of certification*, AMA (Nov. 10, 2014), https://www.ama-assn.org/education/cme/ama-adopts-principles-maintenance-certification (last visited Sept. 11, 2019).

1    including illegal tying of IBC with its MOC, ABMS injures competition in the MOC

2    market and collects mandatory supracompetitive MOC fees from certificated

3    physicians.  ABMS sells MOC directly to plaintiff and Class members across the

4    United States.  There is no legitimate pro-competitive justification defendants might

5    offer for their illegal course of conduct that is not outweighed by the anticompetitive

6    effects alleged herein.

7        47.    By its monopoly of the IBC and MOC markets, ABMS has, and exerts,

8    the power to exclude competition from the MOC market.  Because, as discussed

9    herein, the vast majority of insurers and hospitals in the United States require

10    physicians to have ABMS board certification in order to treat and admit patients,

11    respectively, IBC is necessary for plaintiff and the Class members to meaningfully

12    maintain their commercial medical practices.  With the exception of those doctors that

13    ABMS excluded from the required MOC, the failure of a physician to submit to

14    defendants' imposition of forced and excessive MOC results in the inability of that

15    physician to maintain their IBC and, therefore, to meaningfully maintain their

16    commercial practice.

17        48.    The IBC market is and has been controlled by defendants from the mid-

18    twentieth century to the present.  Since the inception of MOC, ABMS has similarly

19    controlled the MOC market.  Both markets present high entry barriers, not limited to

20    economic and organizational barriers.  ABMS stands alone in selling IBC to

21    physicians; no other source of IBC has meaningfully competed with ABMS in this

22    regard.  And, as discussed herein, because ABMS leverages its IBC market power to

23    illegally tie its MOC to its IBC, meaningful competition in the MOC market is

24    foreclosed.  Indeed, because ABMS will not recognize any competing MOC other

25    than ABMS's MOC in the maintenance of IBC, and because physicians are effectively

26    unable to maintain their commercial practices if they do not purchase MOC from

27    ABMS, ABMS blocks the emergence of any meaningful competition in the MOC

28    market.

49.    The anticompetitive effects of ABMS's conduct is illustrated by the inability of its primary MOC market competitor, the National Board of Physicians and Surgeons ("NBPAS"), to gain market share.[32]   NBPAS requires that a physician possess an ABMS IBC, be properly licensed, and complete a set amount of CME in order to obtain MOC from it.  Making NBPAS MOC desirable to physicians, NBPAS offers MOC at significantly lower fees than ABMS and requires less physician time for compliance.   However, despite its national presence and comparable MOC product, because of ABMS's market power, as of September 2018, according to the NBPAS website, no commercial health insurance provider and less than one percent of hospitals accept NBPAS MOC.[33]   ABMS also refuses to accept competitor MOC, revoking physician's IBC where physicians do not obtain ABMS MOC.  Because of the *de facto* requirement that physicians maintain their IBC with ABMS or lose their certification, competitor MOC providers are effectively excluded from competition.

50.    Plaintiff's and Class members' injuries directly derive from defendants' unlawful conduct.  Defendants' charge increasingly artificially inflated prices for MOC, forcing plaintiff and the Class to incur and continue to incur at least hundreds of millions of dollars in ABMS MOC fees.  Absent defendants' malfeasance, and in a competitive market, Class members would pay significantly lower, competitive prices for MOC from a source other than or in addition to ABMS.

---

[32]  NBPAS does not sell IBC.  It only offers MOC.  This fact also illustrates the distinct nature of the IBC and MOC markets.

[33]  ABMS has not been a passive observer of hospital and commercial payer requirements related to IBC.  To the contrary, ABMS has lobbied directly for and induced these entities and others to require ABMS certification – which includes ABMS MOC, due to defendants' illegal tying conduct – in order to obtain necessary hospital admitting privileges, reimbursement for services from commercial insurance providers, and coverage for malpractice, among other necessary aspects of Class members' medical practices.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to certify the following Class:

> All persons or entities in the United States and its territories who purchased MOC from ABOS or another ABMS member board to maintain their IBC.  The Class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

52.    Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

53.    Plaintiff is a member of the Class, plaintiff's claims are typical of the claims of Class members, and plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and Class members have been injured by defendants' actions in connection with the unlawful conduct alleged herein.   Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

54.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

55.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

56.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.  Among the questions of law and fact common to the Class are:

(a)    Whether defendants violated §1 of the Sherman Act;

(b)    Whether defendants violated §2 of the Sherman Act;

(c)    Whether defendants violated the Cartwright Act and UCL;

(d)    Whether defendants engaged in illegal tying;

(e)  Whether ABMS's monopoly in MOC was illegally created and is being illegally maintained;

(f)  The duration of the illegal conduct alleged in this complaint;

(g)  The nature and character of the acts performed by defendants in violation of the law;

(h)  Whether, and to what extent, defendants' conduct caused injury to plaintiff and members of the Class and the appropriate measure of damages; and

(i)  Whether plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of the Sherman Act, the Cartwright Act, and the UCL.

57.  A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate antitrust claims such as those asserted in this complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action.  Finally, the Class is readily ascertainable.

## COUNT I

### For Violation of §§1 and 2 of the Sherman Act
### on Behalf of Plaintiff and the Class

58.  Plaintiff repeats the allegations set forth above as if fully set forth herein.

59.  Defendants' conduct alleged herein constitutes illegal tying of the purchase of MOC to defendants' initial medical specialty certifications, as well as the creation and maintenance of a monopoly in the MOC market.  During the relevant period, defendants and co-conspirators engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of the Sherman

Act by the conduct alleged herein, artificially reducing or eliminating competition in the MOC market, and artificially fixing, raising, and/or maintaining the costs of MOC in the United States. Such conduct constitutes a *per se* violation of the Sherman Act.

60. Defendants' conduct has anticompetitive effects in the MOC market, and has had and continues to have the effect of artificially inflating the price of purchasing MOC in the United States.

61. As a direct and proximate result of defendants' unlawful conduct, plaintiff and the other members of the Class paid more for MOC than they otherwise would have paid in the absence of defendants' unlawful conduct.

62. By reason of defendants' unlawful conduct, plaintiff and members of the Class have been deprived of free and open competition in the purchase of MOC.

63. As a direct and proximate result of defendants' conduct, plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined.

64. While defendants' conduct as described herein is a *per se* violation of the Sherman Act, it is also unlawful under the rule-of-reason standard, as it an unlawful restraint of trade. There are no legitimate or pro-competitive justifications for defendants' conduct. Plaintiff respectfully submits that the Court should apply well-recognized *per se* rules in order to condemn these challenged trade restraints, but in an abundance of caution pleads this claim in the alternative so that it is raised not only under the *per se* rules, but also under the rule-of-reason standard.

65. Plaintiff and members of the Class are entitled to damages from and an injunction against defendants, preventing and restraining the violations alleged herein. Specifically, plaintiff and members of the Class seek to have current certification become permanent without need for MOC or further recertification.

66. Plaintiff and members of the Class further seek certification reinstatement for those members of the Class whose time-limited certification expired.

## COUNT II

**For Violation of the Cartwright Act,
Cal. Bus. & Prof. Code §16700, *et seq*.,
on Behalf of Plaintiff and Class**

67.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

68.    Defendants' conduct alleged herein violates the Cartwright Act, Cal. Bus. Prof. Code §16700, *et seq.*

69.    Plaintiff brings this claim on behalf of a nationwide class. Alternatively, plaintiff brings this claim on behalf of California residents meeting the class definition.

70.    Defendants' conduct alleged herein constitutes an illegal conspiracy and combination, including tying the purchase of MOC to defendants' initial medical specialty certifications, as well as the creation and maintenance of a monopoly in the MOC market. Such conduct constitutes a *per se* violation of the Cartwright Act.

71.    It is appropriate to bring this action under the Cartwright Act because a large number of members of the Class resides in California, members of the Class conduct their medical practices in California, purchased their MOC in California, many of the illegal tying arrangements were made and executed in California, and because overt acts in furtherance of the conspiracy and wrongful charges flowing from those acts occurred in California.

72.    Defendants' conduct has anticompetitive effects in the MOC market and has had and continues to have the effect of artificially inflating the price of purchasing MOC in California.

73.    As a direct and proximate result of defendants' unlawful conduct, plaintiff and the other members of the Class paid more for MOC than they otherwise would have paid in the absence of defendants' unlawful conduct.

74.    By reason of defendants' unlawful conduct, plaintiff and members of the Class have been deprived of free and open competition in the purchase of MOC.

75.    As a direct and proximate result of defendants' conduct, plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined.

76.    While defendants' conduct as described herein is a *per se* violation of the Cartwright Act, it is also unlawful under the rule-of-reason standard, as it an unlawful restraint of trade.    There is no legitimate or pro-competitive justification for defendants' conduct.  Plaintiff respectfully submits that the Court should apply well-recognized *per se* rules in order to condemn these challenged trade restraints, but in an abundance of caution pleads this claim in the alternative so that it is raised not only under the *per se* rules, but also under the rule-of-reason standard.

77.    Plaintiff and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Cartwright Act.

### COUNT III

**For Violation of the Unfair Competition Law Under
Cal. Bus. & Prof. Code §17200, *et seq*.,
on Behalf of Plaintiff and Class**

78.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

79.    Plaintiff brings this claim under Cal. Bus. & Prof. Code §§17203 and 17204 to enjoin and obtain restitution and disgorgement of all monetary gains that resulted from acts that violated Cal. Bus. & Prof. Code §17200, *et seq*., commonly known as the UCL.

80.    Plaintiff and the members of the Class have standing to bring this action under the UCL because they have been harmed and suffered injury in California during the relevant period as a result of the violations of the Sherman Act and the Cartwright Act as alleged herein.

81.    In formulating and carrying out the alleged agreements and conspiracy, defendants did those things that they combined and conspired to do, including but not limited to, the acts, practices and course of conduct set forth herein, and these acts constitute unfair competition in violation of the UCL.

82.    Defendants' conspiracy had the following effects, among others: (a) competition in the MOC market in California during the relevant period was restrained, suppressed, and/or eliminated; (b) the cost to plaintiff and members of the Class for MOC was inflated; and (c) plaintiff and members of the Class in California during the relevant period have been deprived of the benefits of free and open competition.

83.    As a direct and proximate result of defendants' anticompetitive conduct, plaintiff and members of the Class have been injured in their business or property by paying inflated prices for improperly tied MOC as a result of defendants' unfair and noncompetitive acts during the relevant period.

84.    The anticompetitive behavior, as described above, is unfair, unconscionable, unlawful, and fraudulent, and in any event it is a violation of the policy or spirit of the UCL.

## COUNT IV

### Unjust Enrichment on Behalf of Plaintiff and the Class

85.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

86.    As a result of the unlawful conduct described above, defendants have been and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices for, and unlawful profits on, MOC.

87.    Defendants have benefited from their unlawful acts and it would be inequitable for defendants to be permitted to retain any of the benefits resulting from overpayments made by plaintiff and the members of the Class for MOC during the relevant period.

88.    Plaintiff and the member of the Class are entitled to the amount of defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.  Plaintiff and the members of the Class are entitled to the establishment of a

constructive trust consisting of all ill-gotten gains from which plaintiff and the members of the Class may make claims on a *pro rata* basis.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that the Court enter judgment on plaintiff's behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with plaintiff as the designated Class representative and his counsel as Class counsel;

B.     Defendants violated §§1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2), the Cartwright Act (Cal. Bus. & Prof. Code §16700, *et seq*.), and the UCL (Cal. Bus. & Prof. Code §17200, *et seq*.), and plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violations;

C.     Plaintiff and the members of the Class are entitled to recover damages sustained by them, injunctive relief, and entry of a joint-and-several judgment in favor of plaintiff and the Class against defendants in an amount to be trebled;

D.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the unlawful conduct alleged herein;

E.     Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.     Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.     Plaintiff and members of the Class receive such other or further relief as may be just and proper.

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury of all issues triable by jury.

3    DATED:  September 11, 2019          ROBBINS GELLER RUDMAN
                                          & DOWD LLP
4                                        DAVID W. MITCHELL
                                         CARMEN A. MEDICI
5                                        ARTHUR L. SHINGLER III

6

7                                          *s/ David W. Mitchell*
                                         DAVID W. MITCHELL

8
                                         655 West Broadway, Suite 1900
9                                        San Diego, CA  92101-8498
                                         Telephone:  619/231-1058
10                                       619/231-7423 (fax)

11                                       ROBBINS ARROYO LLP
                                         BRIAN J. ROBBINS
12                                       GEORGE C. AGUILAR
                                         JENNY L. DIXON
13                                       ERIC M. CARRINO
                                         5040 Shoreham Place
14                                       San Diego, CA  92122
                                         Telephone:  619/525-3990
15                                       619/525-3991 (fax)

16                                       Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28